UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RETAIL FUND ALGONQUIN COMMONS, L.L.C., an Illinois Limited Liability Company, by its Manager, IN RETAIL FUND, L.L.C., a Delaware Limited Liability Company, by its Manager, IN RETAIL MANAGER, L.L.C., a Delaware Limited Liability Company, by its Manager, INLAND REAL ESTATE CORPORATION, a Maryland Corporation, <br><br>        Plaintiff, <br><br>   v. <br><br> ABERCROMBIE & FITCH STORES, INC., an Ohio Corporation, <br><br>        Defendant. | Case No. 09 C 5824 <br><br> Judge Marvin E. Aspen |

## **MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is Defendant Abercrombie & Fitch Stores, Inc.'s ("Abercrombie") 12(b)(6) motion to dismiss two counts of Plaintiff Inland Real Estate Corporation's ("Inland") First Amended Complaint. Count I alleges property damage as a result of Abercrombie's negligent supervision, and Count II alleges negligent misrepresentation. For the reasons stated below, we grant Abercrombie's motion as to Count II, but deny it as to Count I.

### **Background**

Inland is the owner of Algonquin Commons, LLC, a high-end retail mall located in Algonquin, Illinois. (Compl. ¶ 1.) In 2003, Abercrombie became a tenant in this retail mall and supervised a team of architects, contractors, and other professionals that was hired to build a

1

"bump-out"—a customized facade protruding from one wall—of its retail store in the mall. (*Id.*
¶¶ 15–16.) At the time of this construction, Abercrombie was aware of topographical grade
differences at the site that potentially would create drainage problems if the bump-out were to be
built but decided to pursue the construction anyway. (*Id.* ¶¶ 17–23.)

In March 2008, Inland became aware that there was a water intrusion problem at the
Abercrombie store. (*Id.* ¶ 28.) This water intrusion caused damage to Abercrombie's retail store
and the adjacent property. (*Id.* ¶¶ 40, 52.) In September 2008, Abercrombie gutted its store and
vacated the premises. (*Id.* ¶ 27.) Throughout September and October of 2008, Abercrombie and
the architects and contractors hired to construct the bump-out denied any prior knowledge of the
drainage dangers posed by the grade differential. (*Id.* ¶¶ 29–34.)

On December 1, 2009, Inland filed its First Amended Complaint ("Complaint") alleging
three claims. Inland alleges negligent hiring and supervision (Count I), (*Id.* ¶¶ 35–40),[1]
negligent misrepresentation (Count II), (Compl. ¶¶ 41–52), and breach of contract (Count III),
(*Id.* ¶¶ 53–69). Upon receiving notice of this Complaint, Abercrombie filed a 12(b)(6) motion to
dismiss Counts I and II.

**Standard of Review**

A motion to dismiss is meant to test the sufficiency of the complaint, not to decide the
merits of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). Accordingly, a
court may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks "enough facts
to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
570, 127 S. Ct. 1955, 1974 (2007); *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50 (2009)
(stating that a court's determination "whether a complaint states a plausible claim for relief will
. . . be a context-specific task"); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618–19

---

[1] Inland has withdrawn its claim for negligent hiring. (Resp. at 13.)

(7th Cir. 2007); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776–77 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Although a sufficient complaint thus need not give "detailed factual allegations," it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65; *see Iqbal*, 127 S. Ct. at 1949 (similarly noting that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"); *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009); *Killingsworth*, 507 F.3d at 618–19. These requirements ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964 (quotation omitted); *see also* Fed. R. Civ. P. 8(a). In evaluating a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 127 S. Ct. at 1949–50; *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602–03 (7th Cir. 2009); *Brooks*, 578 F.3d at 581; *Thompson v. Ill. Dep't. of Prof'l Reg.*, 300 F.3d 750, 753 (7th Cir. 2002).

**Analysis**

Abercrombie first contends that Counts I and II of the Complaint are barred by the *Moorman* doctrine, which provides that economic loss is not recoverable in tort under Illinois law. Because both counts share the same damages and underlying facts, we first consider whether the *Moorman* doctrine bars these claims. *See Nepomoceno v. Knights of Columbus*, No. 96 C 478, 1999 WL 66570 at *11 (N.D. Ill. Feb. 08, 1999) (analyzing the economic loss doctrine first for two claims alleging the same damage). Abercrombie alternatively argues that even if Counts I and II are not barred by *Moorman*, they fail to state a plausible claim for relief.

I.   Moorman Doctrine

In *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 435 N.E.2d 443 (1982), the Illinois Supreme Court held that economic loss is not recoverable in tort, a legal theory now commonly referred to in Illinois as the "*Moorman* doctrine." Illinois law defines economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits without any claim of personal injury or damage to other property." *Adams Labs., Inc. v. Jacobs Eng'g*, 761 F.2d 1218, 1223 (N.D. Ill. 1985) (citing *Moorman*, 91 Ill. 2d at 82, 435 N.E.2d at 449); *see also Nepomoceno*, 1999 WL 66570 at *11. Tort claims are barred because "[c]ontract law provides the proper remedy" for these "disappointed commercial expectations." *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003). "To recover in tort under the economic loss doctrine, a party must show harm above and beyond a party's contractual or commercial expectations." *Id.* (citing *In re Chi. Flood Litig.*, 176 Ill. 2d. 179, 200–01, 680 N.E.2d 265, 276 (1997)).

Property damage, which is the type of damage alleged in this case, caused by "disappointed commercial expectations, gradual deteriorations, internal breakage, or other nonaccidental causes, rather than a dangerous event," is considered economic loss and barred by the *Moorman* doctrine. *In re Chi. Flood Litig.*, 176 Ill. 2d. at 200–01, 680 N.E.2d at 275 (citing *Redarowicz v. Ohlendorf*, 92 Ill. 2d. 171, 177–78, 441 N.E.2d 324, 327 (1982)). Thus, the first critical question for us is whether the particular property damages alleged by Plaintiff should be considered economic loss. In *Redarowicz*, the Illinois Supreme Court addressed the difference between property damage that should be considered economic loss, and thus not recoverable in tort, and property damage that should not be considered economic loss. *Redarowicz*, 92 Ill. 2d at 178, 441 N.E.2d at 327. In that case, the plaintiff was seeking damages for the costs of

replacement and repair of a defectively constructed chimney. *Id.* Because it was "not a case where defective construction created a hazard that resulted in a member of the plaintiff's family being struck by a falling brick from the chimney" and the only danger facing the plaintiff were "additional expenses for living conditions that were less than what was bargained for," the court held that the claim was barred by the economic loss doctrine. *Id.*

This distinction appears in *Moorman* itself, in which the plaintiff purchased a grain storage tank from the defendant, and this tank later developed a crack. *Moorman*, 91 Ill. 2d at 74–74, 435 N.E.2d at 445. The Illinois Supreme Court recognized that a suit in strict liability to recover the cost of repairing this crack was barred by the economic loss doctrine. *Id.* In so holding, the court noted: "Tort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence." *Id.* at 86, 435 N.E.2d at 450. Subsequent decisions have illustrated this principle that "cases in which *Moorman* has been applied are grounded on the notion that the complaining party, if he wished protection against the particular type of harm suffered, could have bargained for a guarantee or warranty against it." *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d. 137, 162, 636 N.E.2d 503, 514 (1994) (quoting *Collins v. Reynard*, 154 Ill. 2d 48, 56, 607 N.E. 2d 1185, 1189 (1992)); *see also 2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill. 2d 302, 309–12, 555 N.E.2d 346, 349–50 (1990); *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 115 Ill. 2d 146, 149–54, 503 N.E.2d 246, 247–50 (1986); *Mars Inc. v. Heritage Builders of Effingham, Inc.*, 327 Ill. App. 3d 346, 357–58, 763 N.E. 2d 428, 438–39 (4th Dist. 2002). Because the *Moorman* doctrine originated in the context of products liability, its application to the construction context is still developing. *See* Mark C. Friedlander, *The Impact of* Moorman *and its Progeny on Construction Litigation*, 77 Ill. Bar J. 654, 655 (1989) (arguing

that the *Moorman* holding has divided construction claims into two types—(1) personal injury and casualty claims and (2) claims based on a fundamental failure of the structure in question, including water leakage).

Alternatively, even if damages are considered economic in nature, they may nonetheless be permitted by *Moorman* if they fall into the "sudden and dangerous occurrence" exception. *Mars, Inc. v. Heritage Builders of Effingham* concisely sets forth the necessary elements to fall under this exception. 327 Ill. App. 3d at 346, 763 N.E. 2d at 428. In this case, the plaintiff brought a claim for negligence against a company that had been hired to unload and erect a steel frame. *Id.* at 348, 763 N.E. 2d at 431. During a severe thunderstorm, the frame collapsed and was irreparably damaged, causing an eight-week delay. *Id.* at 348, N.E. 2d at 432. The appellate court defined "sudden and dangerous occurrences" as "situations when the sudden occurrence is '*highly dangerous and presents the likelihood of personal injury or injury to other property.*'" *Id.* at 353, 763 N.E. 2d at 436 (quoting *Stepan Co. v. Winter Panel Corp.,* 948 F. Supp. 802, 807–08 (N.D.Ill.1996)). Under this definition, the court held that the thunderstorm was a sudden and dangerous occurrence. *Id.* The court then noted that this sudden and dangerous occurrence must be "coupled with personal injury or property damage." *Id.* (quoting *In re Chi. Flood Litig.*, 176 Ill. 2d at 200, 680 N.E. 2d at 275). Furthermore, this property damage cannot be to the defective product or construction defect itself, but must be property damage to "other property." *Id.* at 354, N.E. 2d at 436. In that case, because the claim was based only on the damage to the brace itself and the construction delays, the court found that the claim failed to allege property damage to other property. *Id.* Mirroring the court's reasoning in *Redarowicz*, the *Mars* court, in dicta, noted that the claim would likely not be barred had the complaint alleged that the frame fell and damaged the existing warehouse or vehicles in the area, i.e. "other property." *Id.* at 357,

6

763 N.E. 2d at 439. Because the sudden and dangerous occurrence did not cause damage to this type of other property, the claim was barred by the *Moorman* doctrine.

Two reasonable inferences from the Complaint allow Counts I and II to escape the *Moorman* doctrine. First, the plaintiff in this case alleges that as a result of water intrusion it suffered property damage to "adjacent property" that was not subject to the contractual relationship. (Compl. ¶ 4.) Further, plaintiff alleges that this water intrusion in the adjacent property was the result of the plaintiff's breach of its duties during the bump-out of the Abercrombie store. (Compl. ¶ 5.) Damage to the adjacent property is not simply disappointed economic expectations or deterioration because it is seemingly outside the parties' contractual relationship, an inference in Plaintiffs' favor we must draw at this stage. If Abercrombie can come forward with specific facts demonstrating that all damaged property is within the contractual relationship, then the damage to this property would be considered economic loss under *Moorman*.

Second, it is reasonable to infer that the water intrusion was a sudden and dangerous occurrence permitting the recovery of some economic damages despite *Moorman*. One difficulty in this case is that the Complaint does not define the exact nature of the water intrusion. While we agree with Abercrombie that "lost rent" and the repair of the sidewalk slope are barred by the *Moorman*, (Reply at 8), the Complaint also alleges damage to the store and adjacent property, (Compl. ¶ 40). If the water intrusion problem is simply water leakage, resulting in the gradual deterioration of property covered by the contractual relationship (i.e., *not* a sudden or dangerous occurrence), then Abercrombie will have the opportunity to demonstrate this fact and move for summary judgment. However, at this stage we must reasonably infer in Plaintiffs' favor that the water intrusion problem was a sudden and dangerous occurrence,

similar to the thunderstorm in *Mars*. Thus because Plaintiffs have alleged damages to property outside the construction contract, that is outside the cost to repair the defective bump-out, Plaintiffs' claims in Count I and II plausibly qualify for the sudden and dangerous occurrence exception to *Moorman*. Having established that neither of Inland's negligence claims is barred by the *Moorman* doctrine, we can now address each in turn to determine if the complaint properly alleges a claim.[2]

II.     Negligent Supervision

To properly state a claim for negligent supervision, Inland must allege that "(1) the employer had a duty to supervise its employees; (2) the employer negligently supervised an employee; and (3) the negligence proximately caused the plaintiff's injuries." *Finnane v. Pentel of Am.*, 43 F. Supp. 2d 891, 901 n.3 (N.D. Ill. 1999) (quoting *Van Horne v. Muller*, 294 Ill. App. 3d 649, 657, 691 N.E.2d 74, 79 (1st Dist. 2008), *rev'd in part*, 185 Ill. 2d 299, 705 N.E.2d 898 (1998)). The Complaint alleges two different levels of supervision: (1) supervision of the contractors and professionals who designed and implemented the build-out by Abercrombie's Design and Construction Group; and (2) supervision of the Design and Construction Group by Abercrombie.

First, the Complaint alleges that Abercrombie was negligent in its supervision of the contractors and other professionals who actually designed and completed the work on the bump-out. (Compl. ¶ 36.) A supervisor of construction work can be held responsible for the

---

[2] Abercrombie also claims that in the context of property damage, a plaintiff may not simply allege unspecified property damage in order to overcome the *Moorman* doctrine. (Reply at 8) (citing *In re Chi. Flood Litig.*, 176 Ill. 2d. at 201–02, 680 N.E.2d at 275–76). However, the only case Abercrombie cites for this proposition, *In re Chi. Flood Litigation*, dealt with the different pleading standards of Illinois law and not the pleading standard under the Federal Rules. Furthermore, the class of plaintiffs in that case had simply alleged "property damage" without specifying the *type* of property. In this case, the plaintiff has clearly identified the type of property (the mall), but not specified the exact *nature* of the damage (though one can easily infer from the complaint that it is some type of water damage).

negligence of its employees under both direct and agency theories of liability. In agency theories, the supervisor may be held liable under the well-known doctrine of *respondeat superior*. However, in this case Inland alleges that Abercrombie is directly liable for its own negligence in supervising these employees. *See* Restatement (Second) of Torts § 414 (1965) (discussing the direct liability of employers that retain supervisory control over their independent contractors); *Calderon v. Residential Homes of Am., Inc.*, 381 Ill. App. 3d 333, 340–43, 885 N.E.2d 1138, 1145–1148 (1st Dist. 2008) (accepting this theory of direct liability under Illinois law). The Complaint alleges that Abercrombie had a duty to supervise these professionals and negligently failed to do so. (Compl. ¶ 36.) Furthermore, the Complaint alleges that this lack of supervision led to the defective construction, which was the cause of the water damage. (Compl. ¶ 40.) These allegations are sufficient to establish a plausible claim for relief under Illinois law. *See Calderon*, 381 Ill. App. 3d at 342, 885 N.E. 2d at 1146 (noting that the "principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractor's work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself") (citing Restatement (Second) of Torts § 414, comment b); *Normoyle-Berg & Assocs., Inc. v. Village of Deer Creek*, 39 Ill. App. 3d 744, 350 N.E.2d 559 (3d Dist. 1976) (finding that a supervising engineer owed a duty to supervise his workers in order to avoid causing extra construction expenses). On a motion for summary judgment or at trial, Abercrombie will have the opportunity to demonstrate factually that it did not have a duty to supervise its employees in such a way to prevent damage to the property. However, the Complaint alleges that Abercrombie was under a duty to take reasonable care in its supervision of these professionals in

order to avoid the damage that Abercrombie either knew or should have known could result to Inland. This allegation has a sufficient basis in Illinois law, and it is sufficiently plausible to withstand a motion to dismiss.

Although Abercrombie argues that these professionals were independent contractors and not employees, this allegation is a factual objection that is not applicable to a motion to dismiss. Furthermore, even assuming Abercrombie's assertion is true, whether an employer has a duty to supervise an independent contractor is also a case-specific factual inquiry under Illinois law. *See Calderon*, 381 Ill. App. 3d at 340–41, 885 N.E.2d at 1145 (recognizing that "[o]ne who entrusts work to an independent contractor, but who retains the control of any of any part of the work, is subject to [direct] liability [for negligent supervision] for the physical harm to others for whose safety the employer owes a duty to exercise reasonable care").

In a second theory of negligent supervision, the Complaint alleges that Abercrombie had a duty to supervise its own Design and Construction team. (Compl. ¶¶ 36–37, 39.) These individuals are specified by name and alleged to be employees of Abercrombie. (Compl. ¶ 37.) Moreover, the Complaint alleges that Abercrombie breached its duty to Inland's predecessor-in-interest by not supervising the Design and Construction team and ensuring they communicated both to the contractors and to Inland's predecessor-in-interest. (Compl. ¶¶ 39, 44, 46, 49). The Complaint also alleges that the failure of the Design and Construction team to communicate the problems with the grade differential to the contractors and professionals was the proximate cause of the damage to the property. (Compl. ¶ 38–40, 46); *see also* (Resp. at 12–13). These allegations are sufficient, at this stage, to establish a plausible claim for relief.

Abercrombie spends a significant portion of its Reply attempting to distinguish *Normoyle-Berg* as a "pre-*Moorman*" case and citing subsequent suits by contractors against

subcontractors in negligence that were barred by *Moorman*. Inland cites *Normoyle-Berg* to establish the fact that supervisors of construction projects can have a duty, under Illinois law, to supervise the work of their employer. This support for the existence of a duty between the parties has no relation to the determination of whether damages are economic or not. The negligence claims barred by the *Moorman* doctrine cited by Abercrombie do occur in the general construction context, but they all involve economic damages. As discussed earlier, these counterarguments are unpersuasive because the Complaint alleges both that the damage is non-economic damage and not "essentially contract damages," and that the damage fits into the sudden and dangerous occurrence exception even if the damage is economic. (Reply at 7) (citing *Oldenburg v. Hagemann*, 159 Ill. App. 3d 631, 637–38, 512 N.E. 2d 718, 723 (2d Dist. 1987)). Furthermore, the *Normoyle-Berg* decision did not involve a contract between the parties at all, so it is unclear how *Moorman* would alter the holding in that case.

Essentially, Abercrombie reads the *Moorman* cases as establishing a rule that a duty cannot arise between two parties to a contract, i.e. the existence of the contract precludes any claims of negligence. However, the first necessary condition of the *Moorman* doctrine is the existence of economic damages. Even if Abercrombie's duty to supervise these contractors did "ar[i]se under its lease" (Reply at 7), Plaintiffs have plausibly pled that the damage arising from Abercrombie's breach of that duty was noneconomic property damage and not contractual damage. Furthermore, it is not at all clear that Abercrombie's duty to supervise any of its employees or agents necessarily arose out of the lease in question. *See Congregation*, 636 N.E. 2d at 514 ("Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty.").

Based on its Complaint, Inland alleges it can present facts at trial to establish that Abercrombie had a legal duty to supervise its employees and agents, that Abercrombie was negligent in failing to fulfill this duty, and that this negligence resulted in the water intrusion and property damage. As such, the Complaint states a plausible claim for negligent supervision. Accordingly, Abercrombie's motion as to Count I is denied.

III.   Negligent Misrepresentation

To properly state a claim for negligent misrepresentation, Inland must allege "(1) a false statement of material fact, (2) carelessness or negligence in ascertaining the truth of the statement by the party making it, (3) an intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statement, and (5) damage to the other party resulting from such reliance, (6) when the party making the statement is under a duty to communicate accurate information." *Guaranty Residential Lending, Inc. v. Int'l Mortgage Ctr.*, 305 F. Supp. 2d 846, 863 (N.D. Ill. 2004) (quoting *Fox Assocs, Inc. v. Robert Half Int'l, Inc.*, 334 Ill. App. 3d 90, 94, 777 N.E.2d 603, 606 (1st Dist. 2002)). Generally, no duty exists to provide accurate information unless the "defendant is in the business of providing information for the guidance of others in their business dealings." *Id.*; *see also LeDonne v. Axa Equitable Life Ins. Co.*, 411 F. Supp. 2d 957, 963–64 (N.D. Ill. 2006); *Tolan & Sons, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 27, 719 N.E.2d 288, 296 (1st Dist. 1999).

The Complaint alleges two potential negligent misrepresentations. First, Inland alleges that Abercrombie failed to notify the Design and Construction Group of the dangers posed by the different grade levels that two firms hired by Inland had identified. (Compl. ¶ 46, 51.) Second, Inland alleges that Abercrombie failed to notify Inland in 2008, after the damage had occurred,

of the failure of the contractors to follow these warnings in the actual construction. (Compl. ¶¶ 47, 51.)

Turning to the first instance, Inland alleges that Abercrombie's Design and Construction Group is employed specifically to oversee the construction of stores and provide communication between the company and the landlord, (Compl. ¶¶ 44, 49), and therefore is "in the business of providing information." The question of whether a defendant is "in the business of providing information" depends on whether "the product was purely information," i.e. "the consumer received analytical work rather than a tangible product." *Guaranty*, 305 F. Supp. 2d at 864; *see also Tolan*, 308 Ill. App. 3d at 26, 719 N.E.2d 288, 295. Although it is highly questionable whether the Design and Construction Group's product in this case could be said to be "purely information," the answer is irrelevant here because Inland never received any false information from them. Inland is essentially arguing that Abercrombie had a duty to convey accurate information (of which Inland's predecessor-in-interest was aware) to the contractors and other employees working on the build-out. Furthermore, Inland does not allege that Abercrombie provided a false statement of material fact to these third-party contractors, but only that Abercrombie neglected to give them all the information necessary to prevent the defect that led to the water intrusion. While this failure may have been negligent supervision, it does not constitute a misrepresentation.

In addition, the negligent misrepresentation claim does not satisfy either the fourth or fifth elements outlined above. The damage in this case cannot be said to have resulted from the reliance of Inland's predecessor-in-interest on any misrepresentation. The Complaint does not assert that Inland's predecessor-in-interest relied on Abercrombie's alleged failure to convey information or that the alleged damage was the result of such reliance. The Complaint's

language itself demonstrates how far this first allegation is from negligent misrepresentation, phrasing the violation as "negligently failing to properly act on Plaintiff's behalf to ensure information was accurately conveyed to contractors and professionals." (Compl. ¶ 51.) This allegation cannot plausibly be read to establish a negligent misrepresentation claim.

The second instance of negligent misrepresentation is much closer. Inland alleges that Abercrombie provided a false statement of material fact to Inland itself when it denied having knowledge of the defective condition of the site. (Compl. ¶¶ 32, 46.) Although this does establish an instance of misrepresentation between the two parties in the case, Inland does not connect its reliance on this misrepresentation to any damages. The Complaint alleges that Inland "attempted to work with" Abercrombie because it "believed the misrepresentation," (Compl. ¶ 33), but it is unclear what damage this continued cooperation caused. The property damage that is properly the subject of a tort claim and not barred by the *Moorman* doctrine is alleged to have occurred in 2008 as a result of the water intrusion. Even if Abercrombie did in fact misrepresent to Inland in 2009 that it had no knowledge of the construction defect, this second alleged misrepresentation occurred long after the design and construction of the "bump-out" and a year after the water damage had occurred.

The Complaint does not allege that Inland's reliance upon Abercrombie's alleged misstatement caused any further damage to the property or other non-economic loss. As such, this second allegation fails to state a claim of negligent misrepresentation. Accordingly, Abercrombie's motion to dismiss for failure to state a claim is granted with respect to Count II.

## Conclusion

For the reasons set forth above, we grant the motion to dismiss Count II of the First Amendment Complaint and deny the motion with respect to Count I. It is so ordered.

                                                          _____
                                                          Honorable Marvin E. Aspen
                                                          United States District Judge

Date: May 10, 2010